# CHARLESTON.

MILLER *v.* CLENDENIN, *et al.*

Submitted June 19, 1896—Decided Nov. 25, 1896.

NEGOTIABLE INSTRUMENTS—INDORSERS—JOINT MAKERS—PROTEST.
    One makes a negotiable note to a payee, and others put their names on its back, the payee not indorsing it, and it is then delivered to payee. He may treat them all as joint makers, or he may treat the two putting their names on its back as indorsers or guarantors, as he chooses, unless he agrees, before or on delivery of the note, to treat them in a particular one of those characters. Unless he agrees to treat them as indorsers, no protest or notice of non-payment is necessary to hold them as joint makers or guarantors.

TOMLINSON & WILEY for plaintiff in error, cited 10 W.

Va. 470; 22 How. 350; 56 N. W. Rep. 727; 13 Atl. Rep.
331; 14 Atl. Rep. 741; 1 N. W. Rep. 930; 3 N. W. Rep.
944; 24 Fed. Rep. 221; 37 W. Va. 666; 12 R. I. 270; 95 U.
S. 90; 17 Atl. Rep. 42; 56 N. W. Rep. 727; 99 Mass. 179;
108 Mass. 509; 2 Mich. 555; 41 Mich. 196; 42 Mich. 329; 7
Minn. 446; 11 Minn. 410; 41 N. H. 434; 60 Mo. 297; 45 Mo.
502; 35 N. J. Law, 517; 63 N. C. 191; 82 N. C. 313; 6 R. I.
505; 25 Fed. Rep. 221.

W. R. GUNN, J. S. SPENCER and C. E. HOGG for defend-
ants in error, cited 10 W. Va. 470; 41 W. Va. 787.

BRANNON, JUDGE:

Miller brought an action upon a negotiable note made by
Clendenin, payable to Miller, on the back of which Barbee
and Mossman wrote their names, in which action the court
gave judgment against Clendenin, but discharged Barbee
and Mossman. Miller appeals.

Miller, the payee, did not put his name on the note, and,
Barbee and Mossman having indorsed their names on it be-
fore delivery to the payee, the law is settled that Miller had
the right to treat Barbee and Mossman as joint makers with
Clendenin, indorsers, or guarantors, just as he chose, unless
there was an agreement between Miller and them to hold
them as indorsers. *Hansford* v. *Burton,* 10 W. Va. 470;
*Long* v. *Campbell,* 37 W. Va. 666 (17 S. E. 197); *Milling Co.* v.
*Watkins,* 41 W. Va. 787 (24 S. E. 612). It is claimed, how-
ever, that there was such agreement, not pointed or ex-
press, but that an understanding existed, tantamount to an
agreement, that Barbee and Mossman indorsed as indorsers,
and were to be notified of non-payment, and they were not
notified, and so are not liable. The evidence is utterly in-
adequate to show such an understanding as will relieve
them. Clendenin asked Miller to lend him two hundred
and fifty dollars and Clendenin says, in evidence, "My re-
collection is that he told me I could have the money, if I
could get indorsers or security—I don't remember which."
Clendenin asked him if he would take Barbee and Mossman,
and he said that he would, but they must sign as individ-
uals, not as a firm, they being partners. That is all that

took place between Miller and any of the parties to the note before its delivery. Clendenin went to Barbee and Mossman, got the latter to draw the note, got their signatures, took it to Wiley, with whom Miller had left his check to be delivered on delivery of the note, and simply delivered the note to Wiley for delivery to Miller; and Clendenin got the check, and Wiley delivered the note to Miller. Clendenin does not say that there was any agreement between him and Miller that Barbee and Mossman were to hold the character of indorsers, rather than any other character. If Miller had said that Clendenin was to get them to sign as indorsers, it might be said that the word "indorsers" would have its legal meaning, and even then it would be short evidence to deprive the creditor of the right which the law gave him upon such a note—the right to treat them as makers, indorsers, or guarantors. But Clendenin is particular to say that he does not remember whether the word "indorser" or "security" was used. They would have different meanings in such case. Even if "indorser" were used, it would not, alone, tie Miller down to regard the parties as such, as it would be construed only in the general sense of surety. When this note was presented to Barbee and Mossman, without Miller's name on its back, they were bound to know, as a matter of law, that, when they made such an irregular indorsement, it gave Miller the right to treat them as makers. They were not told that Miller had agreed to treat them as indorsers. They simply put their names on the back of the note, without any understanding that they were to stand as indorsers, technically so called. They say that they understood that they were to be so bound, but they do not say that even Clendenin told them so. It appears from their evidence that, as the note was payable at a bank in four months, they thought it would be presented there when due, and protested; but that was a mere inference, as one can plainly see from their evidence. Any such understanding between Clendenin, Barbee, and Mossman, not known to Miller, would not bind him. *Long* v. *Campbell*, 37 W. Va. 665 (17 S. E. 197). Clendenin himself says that he can not say that there was any understanding between

him and Miller that the note was to go into bank. Of course not. The note was not yet in existence. When it came to Miller, it was not a note calling for that. How unreasonable to say that Miller made with Clendenin a particular agreement to treat Barbee and Mossman as indorsers, when the note had not yet been drawn, or its character mentioned! Did they know whether all would sign as makers, or that one would sign, and the others make an irregular indorsement, so as to call for a special agreement? Surely not. Miller had been an experienced bank officer. If there had been an agreement to put it in bank, or to treat Barbee and Mossman as indorsers, would he not have so treated it, most likely? But the latter matter is said to be forceful against Miller. Years after the note matured, he asked Clendenin to give him a new note, saying that he had no security on that note at all; that he could not hold Barbee and Mossman any longer. He said to Mossman that he wanted him and Barbee to give a new note; that he could no longer hold them, the time having expired. This was more than four years after the maturity of the note, and Clendenin had become insolvent. What does this talk mean? Not a release, for he still claimed the debt, and there was no consideration for it as a release. But it is not relied upon as a release, but as showing that, from the beginning, Miller regarded Barbee and Mossman as indorsers. Unless such was the agreement, he could change his mind, even if he so intended, or, through ignorance of law, knew no better; for, as said in *Hansford* v. *Burton, supra,* the payee may exercise the option to treat those who put their names on the note in one character or another "at any time, and, so long as he holds the note, it may be changed at his pleasure, even after suit." What did he mean by "the time running out," or he "could hold them no longer?" This does not show any agreement prior to the note to hold them as indorsers; for, if so, they would be absolved, and he still looked on them as bound, as he demanded a new note. May be, the old man (of 85 years) thought the 5-years bar was yet law, and would soon be gone. What did he mean by "having no security?" May be, he thought it not good. Anyhow, he did not look

upon Barbee and Mossman as released—else why demand a new note? If he was even under error of law in thinking them discharged, and had explicitly said so, that mistake would not prevent his recovery, unless it showed a prior agreement that they should contract as indorsers, and the evidence is too slim and inconclusive to establish that and defeat a plain legal right.

The judgment is reversed, and judgment given against all three defendants.